Slip Op. 16-118

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HANGZHOU YINGQING MATERIAL CO. AND HANGZHOU QINGQING MECHANICAL CO.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | **PUBLIC VERSION**<br><br>Before: Leo M. Gordon, Judge<br><br>Court No. 14-00133 |

**OPINION and ORDER**

[Commerce's final results sustained in part and remanded in part.]

Dated: December 21, 2016

    Gregory S. Menegaz, deKieffer & Horgan of Washington, DC, for Plaintiffs Hangzhou Yingqing Material Co. and Hangzhou Qingqing Mechanical Co. With him on the brief were J. Kevin Horgan and John J. Kenkel.

    Carrie A. Dunsmore, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, for Defendant United States. With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was David P. Lyons, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

    Frederick P. Waite, Vorys Sater Seymour and Pease, LLP of Washington, DC, for Defendant-Intervenor M&B Metal Products Company, Inc. With him on the brief were Kimberly R. Young and William M. R. Barrett.

    Gordon, Judge: This action involves the fourth administrative review (and aligned new shipper review) conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering steel wire garment hangers from the People's

Republic of China ("PRC"). See Steel Wire Garment Hangers from the PRC, 73 Fed. Reg. 58,111 (Dep't Commerce Oct. 6, 2008) (antidumping order) ("Order"); Steel Wire Garment Hangers from the PRC, 78 Fed. Reg. 70,271 (Dep't Commerce Nov. 25, 2013) (prelim. results admin. rev. and new shipper rev.) ("Preliminary Results") and accompanying Decision Mem. for the Prelim. Results of the 2011-2012 Antidumping Duty Admin. Rev. and New Shipper Rev., A–570–918, (Nov. 18, 2013), PD 71[1] at bar code 3164295-01, ECF No. 22 ("Preliminary Decision Memo"); Steel Wire Garment Hangers from the PRC, 79 Fed. Reg. 31,298 (Dep't Commerce June 2, 2014) (final results admin. rev. and new shipper rev.) ("Final Results") and accompanying Issues and Decision Mem. for Steel Wire Garment Hangers from the PRC, A–570–918, (May 27, 2014), PD 129 at bar code 3204635-01, ECF No. 22 ("Final Decision Memo").

Before the court is the USCIT Rule 56.2 motion for judgment on the agency record of Plaintiffs Hangzhou Yingqing Material Co. and Hangzhou Qingqing Mechanical Co. ("Plaintiffs" or "Yingqing"). See Pls. Hangzhou Yingqing Material Co. and Hangzhou Qingqing Mechanical Co.'s Rule 56.2 Mem. Supp. Mot. J. Agency R., ECF No. 27 ("Yingqing Br."); see also Def.'s Opp'n Pls.' Mot. J. Admin. R., ECF No. 32; Def.-Intervenor M&B Metal Prods. Co.'s Opp'n Pls.' Mot. J. Admin. R., ECF No. 35; Pls.' Reply Br. Supp. Mot. J. Agency R., ECF No. 38 ("Yingqing Reply"). The court has

[1] "PD" refers to a document contained in the public administrative record, and "CD" refers to a document in the confidential administrative record.

jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[2] and 28 U.S.C. § 1581(c) (2012).

Plaintiffs challenge (1) Commerce's selection of Thailand as the primary surrogate country, (2) Commerce's valuation of several of Yingqing's factors of production ("FOPs"), i.e., paint, thinner, and corrugated paperboard, (3) Commerce's rejection, as untimely, of factual information submitted by Yingqing, (4) Commerce's allocation of labor costs in determining surrogate financial ratios, and (5) Commerce's valuation of Yingqing's brokerage and handling ("B&H") costs. For the reasons that follow, the court sustains Commerce's determinations with respect to the first three issues but remands Commerce's allocation of labor costs and its valuation of Yingqing's B&H costs.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2016). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2016).

## II. Discussion

### (A) Primary Surrogate Country Selection

In an antidumping duty administrative review, Commerce determines whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price and the normal value of the merchandise. 19 U.S.C. §§ 1675(a)(2)(A), 1677b(a). In the non-market economy ("NME") context, Commerce calculates normal value using data from surrogate countries to value the FOPs. 19 U.S.C. § 1677b(c)(1)(B). Commerce must use the "best available information" in selecting

surrogate data from "one or more" surrogate market economy countries. 19 U.S.C.

§ 1677b(c)(1)(B), (4). The surrogate data must "to the extent possible" be from a market

economy country or countries that are (1) "at a level of economic development

comparable to that of the [NME] country" and (2) "significant producers of comparable

merchandise." 19 U.S.C. § 1677b(c)(4). Commerce has a stated regulatory preference to

"normally . . . value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2)

(2013). Commerce utilizes a four-step process to select a surrogate country:

> (1) the Office of Policy . . . assembles a list of potential surrogate countries
> that are at a comparable level of economic development to the NME
> country; (2) Commerce identifies countries from the list with producers of
> comparable merchandise; (3) Commerce determines whether any of the
> countries which produce comparable merchandise are significant producers
> of that comparable merchandise; and (4) if more than one country satisfies
> steps (1)–(3), Commerce will select the country with the best factors data.

Vinh Hoan Corp. v. United States, 39 CIT ___, ___, 49 F. Supp. 3d 1285, 1292 (2015)

(internal quotation marks omitted) (quoting Import Admin., U.S. Dep't of Commerce,

Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004)

("Policy Bulletin"), available at http://enforcement.trade.gov/policy/bull04–1.html (last

visited this date)).

When multiple countries are at a level of economic development comparable to

the NME country and are significant producers of comparable merchandise, Commerce

evaluates the reliability and completeness of the data in the potential surrogate countries.

Commerce generally selects the country with the best data as the primary surrogate.

See 19 C.F.R. § 351.408(c)(2); see also Policy Bulletin at 4 ("[D]ata quality is a critical

consideration affecting surrogate country selection."). When choosing the "best available" surrogate data on the record, Commerce selects, to the extent practicable, surrogate data that "are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." Qingdao Sea–Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

In accordance with the four-step process in the Policy Bulletin, Commerce's Import Administration Office of Policy issued a non-exhaustive list of potential surrogate countries ("OP's List"). The OP's List contained six countries, including Thailand and the Philippines, but not Ukraine. See Surrogate Country and Values Letter, PD 27 at bar code 3118518-01 (Feb. 8, 2013), ECF No. 33. In the Final Results, Commerce selected Thailand as the primary surrogate country because Thailand was (1) "at a level of economic development comparable to that of the PRC"; (2) "a significant exporter of comparable merchandise"; and (3) "Thailand provide[d] the best opportunity to use quality, publicly available data to value [Plaintiffs'] FOPs . . . ." Final Decision Memo at 6.

Plaintiffs do not challenge the selection process itself, nor do they take issue with Commerce's findings that Thailand is at a level of economic development comparable to the PRC and is a significant exporter of comparable merchandise. Rather, Plaintiffs question the reasonableness of Commerce's finding that Thailand is a source of best available data. In particular Plaintiffs argue that Commerce's selection of Thailand was unreasonable because Ukraine or, alternatively the Philippines, offered data that are more specific to Plaintiffs' experience than Thai import data and because import data from

Thailand are unreliable. See Yingqing Br. 8-20. For the reasons that follow, the court

sustains Commerce's selection of Thailand as the primary surrogate country.

In making its primary surrogate country selection, Commerce emphasized the

specificity of data regarding the carbon content of steel wire rod—the main input for the

subject merchandise. The rod's carbon content was critical for Commerce because it was

relevant to the rod's malleability and the ease with which the rod could be formed into

hangers. Commerce determined that "by using a [Harmonized System ("HS")] code with

a carbon [content] most specific to that consumed by Respondents, [Commerce] more

accurately captures the experience of the respondents in calculating [surrogate values]."

Final Decision Memo at 7.

Plaintiffs reported that they consumed wire rod with a certain carbon content.[3] Id.

(citing Yingqing Section C & D Quest. Resp., Ex. C-1, CD 11 at bar code 3115665-01,

PD 21 at bar code 3115677-01 (Jan. 18, 2013), ECF Nos. 28, 29). More particularly,

Plaintiffs placed a steel mill certificate on the record ("Mill Certificate") regarding the

carbon content of the wire rod.[4] See id. at 15; see also Yingqing's Section A Supplemental

Quest. Resp. at 1 & Ex. SQ2-1, CD 23 at bar code 3120917-01, PD 30 at bar code

3120920-01 (Feb. 26, 2013), ECF Nos. 28, 29 (noting, in response to Commerce's inquiry

regarding how Plaintiffs determined the carbon content of their steel input, that "[t]he

---

[3] Plaintiffs reported consuming [[
                                       ]].
[4] The Mill Certificate [[
                            ]] during the POR.

carbon content for the steel used to produce hangers is determined from the mill certificate . . . provided by the supplier.").

In determining which potential surrogate country's data best reflected the carbon content of Plaintiffs' wire rod, Commerce compared certain Thai, Ukrainian, and Philippine HS subheadings and industry data sources:

- Thailand:
    - 7213.91.00.010 (< 0.08 percent carbon)
    - 7313.91.90.010 (< 0.06 percent carbon)
    - 7213.91.00.020 (between 0.08 percent and 0.10 percent carbon)
    - 7213.91.90.011 (between 0.06 percent and 0.10 percent carbon)

- Ukraine:
    - "Metal Expert" carbon content of less than 0.22 percent
    - Global Trade Atlas import statistics for HS subheading 7213.91.41.00 (with carbon content of 0.06 percent or less) and 7213.91.49 (with carbon content over 0.06% but less than 0.25%)

- Philippines:
    - 7213.91.99.01 (< 0.60 percent carbon).

See Final Decision Memo at 15. Commerce determined that the Thai HS subheadings provided the best available data because they more specifically corresponded to the carbon content of the wire rod used by Plaintiffs, at least according to the Mill Certificate. The import data derived from the Thai HS subheadings covered wire rod with a carbon content of less 0.10%, whereas import data derived from the Ukrainian subheadings covered a broader range, i.e., wire rod with less than 0.25% carbon content, and data derived from the Philippine subheading covered an even broader range, i.e., less than 0.60% carbon content. See id. at 15-16.

Plaintiffs filed the Mill Certificate noting that "[t]he carbon content for the steel used to produce hangers is determined from the mill certificate . . . provided by the supplier." Yingqing's Section A Supplemental Quest. Resp. at 1 & Ex. SQ2-1, CD 23 at bar code 3120917-01, PD 30 at bar code 3120920-01 (Feb. 26, 2013), ECF Nos. 28, 29. Despite that, Plaintiffs now contend Commerce unreasonably found the wire rod described in the Mill Certificate was not representative of the wire rod consumed. Yingqing Br. 11. Instead, Plaintiffs maintain they consumed a variety of wire rod, and therefore, Commerce should have selected the Ukrainian information. See id. 12-13. Alternatively, Plaintiffs argue (somewhat inconsistently) that Commerce should have selected the Philippine information not because the Philippines has more specific data on carbon content, but because it has better quality information regarding financial ratios. See id. 20 (arguing that Philippine financial statements on the record pertain to companies that produce comparable merchandise using inputs and production processes similar to those of Plaintiffs).

Problematically for Plaintiffs, the administrative record does reasonably support Commerce's finding that Thai HS subheadings are more specific to the steel wire rod used by Plaintiffs. The Thai data simply covered Plaintiffs' wire rod reflected in its Mill Certificate more particularly than either the Ukraine or Philippine data. Although Plaintiffs "claim[ed] to use wire rod with a broader range of carbon content," Commerce reasonably found that they had not "demonstrated such consumption beyond what is demonstrated in the [Mill Certificate]." Final Decision Memo at 15.

Turning to Plaintiffs' proposed alternative surrogate countries, Plaintiffs' arguments in favor of Ukraine are unpersuasive. Thailand, unlike Ukraine, was on the OP's List. "Although the OP's list is not exhaustive and parties may request that Commerce select a country not on the list, Commerce generally selects a surrogate country from the OP list unless all of the listed countries lack sufficient data." Jiaxing Bro. Fastener Co. v. United States, 38 CIT ___, ___, 961 F. Supp. 2d 1323, 1328 (2014); see also Final Decision Memo at 6 ("Regarding Ukraine as a potential surrogate country, [Commerce] fulfills the statutory requirement to value FOPs using data from a non-exhaustive list of 'one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country.'"). Here, Commerce reasonably found that Thailand provided sufficient data regarding the FOPs, and Thai data regarding the main input were more specific to Plaintiffs' experience during the POR than either Ukrainian or Philippine data.

On the issue of the reliability of Thai import data, Plaintiffs challenge the adequacy of Commerce's consideration of certain government and industry reports in the record expressing concern about Thai Customs Department practices. See Yingqing Br. 6 ("In the last three published [Office of the U.S. Trade Representative or "USTR"] Trade Barriers Report, the USTR has stated the United States' government continual 'serious concern' of the 'significant discretionary authority' exercised by the Thai Customs Department to 'arbitrarily increase the customs value of imports.'"); see also id., Attach. 1 (Yingqing Admin. Case Br.) at 20-23. In particular, Plaintiffs question the reasonableness

of Commerce's reliance on two prior cases in which Commerce considered the same or

similar reports and declined to reject Thai import data as unreliable. In the Final Results,

Commerce explained its reliability determination as follows:

> We disagree with Yingqing's . . . concerns over the reliability of the Thai
> import data, as outlined in the USTR reports. In two recent cases, Xanthan
> Gum and Certain Steel Threaded Rod from the PRC . . . [Commerce]
> determined that the USTR reports do not make Thai import data unreliable
> or inferior to Philippine data, and we declined to conclude that all Thai import
> data should be rejected due to the reports. Additionally, while the European
> Community and Philippines requested consultations with Thailand at the
> World Trade Organization regarding how Thailand values its imports, we
> note that these are only requests for consultations and not adverse findings
> or determinations. Therefore, we continue to find in this case that the USTR
> reports do not provide sufficient evidence to reject all Thai import data as
> unreliable.

Final Decision Memo at 6.

It is worth noting that Elkay Manufacturing Co. v. United States, 40 CIT ___,

180 F. Supp. 3d 1245 (2016) recently addressed challenges to the reliability of Thai

import data based on similar arguments and information, including government and

industry reports. The court observed that although "[t]he evidence of manipulation was

relevant to the question of reliability of the Thai data," the court accepted Commerce's

finding that the reports "[did] not establish that Thai Customs import values are affected

generally, and significantly, by the practice the [USTR] identified." Id., 40 CIT at ___,

180 F. Supp. 3d at 1254-55 (quoting Commerce's conclusion on remand that the "reports

of manipulation of customs values by the Thai government did not 'address any of the

raw material inputs that are consumed by the respondents.'"). According to Elkay, "[t]he

record evidence of manipulation of customs values does not rise to such a level that

Commerce was left with no choice but to foreclose <u>any</u> use of Thai import data to determine a surrogate value for a production input." <u>Id.</u> 40 CIT at ___, 180 F. Supp. 3d at 1255 (emphasis in original). Plaintiffs have not pointed to any evidence in this administrative record that would require a different conclusion than reached in <u>Elkay</u>.

Here, Commerce reasonably found the import data based on Thai HS subheadings were more specific to Plaintiffs' reported experience than Ukrainian and Philippine data. <u>See</u> <u>Jiaxing Bro. Fastener Co. v. United States</u>, 822 F.3d 1289, 1300-01 (Fed. Cir. 2016) (affirming Commerce's choice of data which "matche[d] more closely to the main input of the subject merchandise than the data that [Appellant] propose[d].")). Accordingly, Commerce's selection of Thailand as the primary surrogate country is sustained.

### (B) Valuation of Plaintiffs' FOPs

Commerce used import data derived from Thai HS subheadings to value Plaintiffs' paint, thinner, and corrugated paperboard FOPs. <u>See</u> <u>Final Decision Memo</u> at 22-23. Plaintiffs challenge Commerce's choice of subheading to classify each of these inputs. <u>See</u> Yingqing Br. 25-29; Yingqing Reply 11-14.

### (i) Paint

Commerce valued Plaintiffs' paint using Thai HS subheading 3208.90.90.000, a basket provision covering "paints and varnishes, other, not otherwise described." <u>See</u> <u>Final Decision Memo</u> at 23. Plaintiffs argue this was unreasonable. <u>See</u> Yingqing Br. 27-28. The court sees no merit in this issue. Plaintiffs proposed multiple, conflicting possibilities to value its paint. Confronted with this fog of confusion, Commerce

reasonably selected a broader basket provision that covered Plaintiffs' paint. Plaintiffs themselves did not know which surrogate value was appropriate for their paint. On the one hand, Plaintiffs proposed Thai HS subheading 3209.10 covering paint in an aqueous medium, but Plaintiffs contradicted themselves by reporting that it used paint dissolved in a "non-aqueous medium." Final Decision Memo at 23 (citing Yingqing Section D Quest. Resp. at 2, PD 21 at bar code 3115677-01 (Jan. 18, 2013), ECF No. 29). Plaintiffs also proposed subheading 3208.90.19.000, covering "varnishes (including lacquers) exceeding 100ºC heat resistance," and subheading 3208.90.29.00, covering "varnishes (including lacquers) not exceeding 100ºC heat resistance," but did not substantiate which of the two subheadings should apply by providing information about the heat resistance of their paint. Yingqing Br. 27 (emphasis added). Commerce reasonably determined that "[r]ecord evidence [did] not demonstrate Yingqing used the paints classified under the more specific [subheadings]." Final Decision Memo at 23. The court is having a hard time understanding what Plaintiffs expect from the court on this issue. Suffice it to say, Commerce's choice of an HS basket provision that covers Plaintiffs' paint seems like a reasonable, if not correct, choice given the confusing alternatives proposed by Plaintiffs. Commerce's choice of the surrogate value for paint is therefore sustained.

### (ii) Thinner

Commerce valued thinner using Thai HS subheading 3814.00.00.090, a basket provision covering "organic composite solvents and thinners, other." See Final Decision Memo at 22. As with the paint input, Plaintiffs again proposed multiple alternatives to value their thinner: (1) Thai HS subheading 3814.00, covering "organic composite

solvents and thinners, not elsewhere specified or included: prepared paint or varnish removers," or (2) Thai HS subheading 3814.00.00.001, covering "organic composites solvents and thinners, not elsewhere specified or included: containing methyl ethyl ketone more than 50% w/w [by mass]." Yingqing Br. 37-38. Plaintiffs fault Commerce for using a basket provision instead of the categories they prefer.

Here again though, Plaintiffs failed to establish on the record the composition of their thinner. Given the absence of information in the record to support the selection of a specific subheading, Commerce's selection of a basket provision to value Plaintiffs' thinner was reasonable, if not correct. Plaintiffs advocated for two different subheadings, apparently unsure of which HS provision most closely described their own thinner, and failed to place information on the record that would support either of their proposed subheadings. See Final Decision Memo at 22 ("[T]here is no evidence on the record that suggests Yingqing's thinner contains methyl ethyl ketone."). By positing multiple potential alternative surrogate data sets (HS provisions), Plaintiffs implicitly concede that one clear correct choice is unavailable for the thinner. This makes it challenging for the court to invalidate Commerce's selection of a basket provision as unreasonable. To order Commerce to use another subheading, the court would have to rely on Plaintiffs' preferred inferences about its thinner composition, rather than direct information on the administrative record. This asks too much of the court. Given the murky indeterminacy of the record, the court must sustain Commerce's reasonable selection of the basket provision to value Plaintiffs' thinner.

### (iii) Corrugated Paperboard

Commerce valued Plaintiffs' corrugated paperboard under Thai HS subheading 4819.10, covering "cartons, boxes and cases, corrugated paper and paperboard." See Final Decision Memo at 24. Plaintiffs argue that Commerce should have used subheading 4808.10, covering "corrugated paper and paperboard, whether or not perforated, in rolls or sheets," as it did for the mandatory respondent. Yingqing Reply 14. Plaintiffs' argument assumes that the record supports a finding that Plaintiffs consumed paperboard "in rolls or sheets." Commerce reasonably found, however, that "[u]nlike for [the mandatory respondent], the record does not indicate whether Yingqing's input is in rolls or sheets . . . . Yingqing reported that it purchased its corrugated packing material ready for use." Final Decision Memo at 24. Based on Plaintiffs' description of the input and their "statement that its paperboard was ready to use," Commerce concluded that subheading 4819.10 "better matche[d] Yingqing's reported input description." Id. Given the absence of information that Plaintiffs' paperboard came in rolls or sheets and Plaintiffs' statement that its paperboard was ready to use, Commerce reasonably chose a subheading that covered corrugated paperboard and ready to use packing materials, including "cartons, boxes or cases." Therefore, Commerce's valuation of Plaintiffs' corrugated paperboard is sustained.

### (C) Commerce's Rejection of Plaintiffs' Submission

On December 2, 2013, Plaintiffs submitted factual information to Commerce to "clarify[] and rebut[] the Preliminary Results." Commerce Mem. Rejecting Yingqing New

Factual Information, PD 77 at bar code 3166938-01 (Dec. 5, 2013), ECF No. 29. Commerce rejected this information as untimely and removed it from the record pursuant to 19 C.F.R. § 351.302(d). See id.

Commerce's regulations provide time limits for the parties' factual submissions. See 19 C.F.R. § 351.301(a). In general, for final results of administrative reviews, factual information is due "140 days after the last day of the anniversary month." 19 C.F.R. § 351.301(b)(2). "Factual information" means "(i) [i]nitial and supplemental questionnaire responses; (ii) [d]ata or statements of fact in support of allegations; (iii) [o]ther data or statements of facts; and (iv) [d]ocumentary evidence." 19 C.F.R. § 351.102(b)(21). Commerce's regulations provide that Commerce "will not consider or retain in the official record of the proceeding . . . [u]ntimely filed factual information, written argument, or other material that the Secretary rejects," except where Commerce extends a time limit for good cause under 19 C.F.R. § 351.302(b).

Plaintiffs do not dispute that their submission contained "factual information," nor do they argue that they submitted that information on a timely basis. Rather, Plaintiffs argue that Commerce abused its discretion in rejecting their untimely submission because there was "good cause" to accept the factual information, i.e., Commerce had never before selected Thailand as the surrogate country in an annual review under the Order, and the Preliminary Results were the first time Commerce set forth the Thai HS classifications used to value Plaintiffs' FOPs. See Yingqing Br. 23. Alternatively, Plaintiffs argue that their own submissions must have been deficient on the issue of the proper

classification of Plaintiffs' FOPs for Commerce to have selected the Thai HS subheadings it chose. Plaintiffs argue that, therefore, Commerce was obligated to issue a supplemental questionnaire pursuant to 19 U.S.C. § 1677m(d), and acted contrary to law by failing to do so. See id. 24-25.

Plaintiffs' arguments are unavailing. The deadline for submitting factual information was March 20, 2013—140 days after the last day of the anniversary month of the underlying Order. See Commerce Mem. Rejecting Yingqing New Factual Information (citing 19 C.F.R. § 351.301(b)(2)). Plaintiffs' submission, however, was made approximately eight months after the regulatory deadline. Plaintiffs cite no authority to support their argument that good cause existed for Commerce to accept Plaintiffs' late filing because in previous reviews Thailand was not selected as the surrogate country to value FOPs. It is well established that "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." Qingdao Sea–Line Trading Co., 766 F.3d at 1387; see also Jiaxing Bro. Fastener Co., 822 F.3d at 1299 ("Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition."). Based on the record, Commerce acted in accordance with its regulations and did not abuse its discretion in rejecting Plaintiffs' untimely submission.

As to Plaintiffs' alternative argument that Commerce was obligated to issue a supplemental questionnaire pursuant to 19 U.S.C. § 1677m(d), Plaintiffs' own subsequent regrets about the robustness and quality of its earlier advocacy do not trigger an obligation

on Commerce to issue supplemental questionnaires. Accordingly, Commerce's rejection

of Plaintiffs' untimely submission is sustained.

### (D) Commerce's Allocation of Labor Cost in Determining Surrogate Financial Ratios

In calculating surrogate financial ratios, Commerce treats labor costs as selling,

general, and administrative ("SG&A") expenses. It is Commerce's practice "'to avoid

double-counting [labor] costs where the requisite data are available to do so.'"

Final Decision Memo at 20 (quoting Certain Frozen Warmwater Shrimp From the Socialist

Rep. of Vietnam, 67 Fed. Reg. 56,158 (Dep't Commerce Sept. 12, 2011) (final results)

and accompanying Issues and Decision Mem. at cmt. 5.B). To avoid double-counting,

Commerce "will adjust the surrogate financial ratios when the available record

information, in the form of itemized indirect labor costs, demonstrates that labor costs are

overstated." Antidumping Methodologies in Proceedings Involving Non-Market

Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg. 36,092, 36,094

(Dep't Commerce June 21, 2011) ("Labor Methodologies"). More particularly, Commerce

looks to the surrogate financial statements on the record and if those statements "include

disaggregated overhead and [SG&A] expense items that are already included in the

[record data used to value labor], [Commerce] will remove these identifiable costs

items." Id.

In the Preliminary Results, Commerce valued labor using 2007 Industrial Census

data published by Thailand's National Statistics Office ("2007 NSO Data"). Preliminary

Decision Memo at 26; see also Prelim. Surrogate Value Mem. at 6-7, PD 72 at bar code

3164312-01 (Nov. 18, 2013). Commerce found that the 2007 NSO Data "reflect[ed] all costs related to manufacturing labor, including wages, benefits, housing, training, etc." Preliminary Decision Memo at 26. To calculate preliminary surrogate financial ratios, Commerce used Philippine financial statements that included itemized details of indirect labor costs. Id. at 20. Accordingly, Commerce adjusted the preliminary financial ratios. Id. at 26.

In the Final Results, Commerce continued to value labor using the 2007 NSO Data. To calculate final surrogate ratios, however, Commerce used the 2012 financial statements of a Thai company, LS Industry Co., Ltd. ("LS Industry"), instead of the Philippine financial statements. Final Decision Memo at 20. Finding that "there [was] nothing on the record to suggest that labor costs [were] overstated," Commerce declined to adjust the financial ratios in the Final Results. Id. (citation omitted).

Plaintiffs do not challenge Commerce's use of the 2007 NSO Data to value labor costs, nor do they contest the use of LS Industry's financial statements. Rather, Plaintiffs contend that Commerce should have adjusted surrogate financial ratios in the Final Results as it did in the Preliminary Results to avoid double counting the labor cost: "[A]ccording to [Commerce's] labor methodologies, all itemized labor costs in a financial statement are covered by the labor rate and must be allocated to the labor column in the financial ratios to avoid double-counting." Yingqing Br. 30. Plaintiffs argue that LS Industry's financial statements itemized labor costs, and that this "means de facto under [the Labor Methodologies] policy, that labor will be double-counted if allocated to

SG&A in the financial ratios." Id. Plaintiffs maintain that Commerce acted unreasonably by failing to adjust surrogate financial ratios in accordance with its prior practice. Id. 30-31 (citing Certain Steel Nails from the PRC, 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014) (final results) ("Nails") and Drawn Stainless Steel Sinks from the PRC, 78 Fed. Reg. 13,019 (Dep't Commerce Feb. 26, 2013) (final determ.)).

Commerce's finding that "there [was] nothing on the record to suggest that labor costs are overstated" is unreasonable. LS Industry's financial statements identify, among other things, "Employee welfare cost" and "Subsidy of Social Security Fund and Workmen Compensation Fund" as a part of administrative cost. See Fabriclean Supply Inc.'s Post-Prelim. Results Surrogate Value Information – Part 7, Attach. 4 (LS Industry 2012 Financial Statement (Eng. trans.)), PD 106-118 at bar code 3178557-07 (Jan. 6, 2014). In Nails, Commerce identified these expenses in LS Industry's 2012 financial statements and treated them as indirect labor expenses, acknowledging that the 2007 NSO Data encompassed "employers' contribution to social security, e.g., 'social security fund, workmen's compensation fund . . . .'". See Certain Steel Nails from the PRC, 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014) (final results) and accompanying Issues and Decision Mem. at cmt. 2, A-570-909, (Mar. 31, 2014), available at http://enforcement.trade.gov/frn/summary/prc/2014-07829-1.pdf (last visited this date) (citing Drawn Stainless Steel Sinks From the PRC, 78 Fed. Reg. 13,019 (Dep't Commerce Feb. 26, 2013) (final determ.) and accompanying Issues and Decision Mem. at Cmt. 4). Accordingly, in Nails, Commerce adjusted the surrogate financial ratios

to avoid double counting the labor cost. Here, Commerce has not adequately explained why it departed from its prior practice in <u>Nails</u> and failed to adjust the financial ratios based on the same or similar record information. Consequently, the court remands this issue for further consideration.

**(E) Commerce's Valuation of B&H Costs**

In the <u>Final Results</u>, Commerce used the World Bank's Doing Business survey for Thailand (2013) to value B&H costs. <u>See</u> <u>Final Decision Memo</u> at 18. Plaintiffs argue that Commerce unreasonably used the World Bank report because it is based on cost data exclusively from one city, Bangkok. Plaintiffs also argue that the identities of many of the report's contributors are not known, and the costs reflected in the report are not representative. As an alternative, Plaintiffs proposed that Commerce use the B&H costs incurred by a Thai exporter of warmwater shrimp, Pakfood Company Limited, to value Plaintiffs' B&H costs. <u>See</u> Yingqing Br. 31-34.

The court previously has affirmed Commerce's use of World Bank data as a reliable and accurate source to value B&H, and does so again here. <u>See, e.g.</u>, <u>Since Hardware (Guangzhou) Co. v. United States</u>, 37 CIT ___, ___, 911 F. Supp. 2d 1362, 1377 (2013) (affirming Commerce's reliance on World Bank Doing Business report and noting report is a "reliable and accurate source"); <u>Foshun Shunde Yongjian Housewares & Hardwares Co. v. United States</u>, 40 CIT ___, 172 F. Supp. 3d 1353 (2016) (affirming Commerce's use of World Bank Doing Business report to value B&H). Commerce found that "the Doing Business survey . . . reflect[s] a broad market average, as Bangkok is the

largest and most industrial city in Thailand, and the survey was done by a trusted source, the World Bank." Id. Commerce also noted that "Doing Business . . . [is] based on multiple sources and companies' actual experience." Id. Commerce therefore reasonably favored the World Bank data over Plaintiffs' proposed alternative data source—the B&H costs of a single exporter of warmwater shrimp—as a suitable surrogate data source for steel wire garment hangers.

However, Commerce's refusal to deduct the cost of obtaining a letter of credit from Plaintiffs' B&H costs was unreasonable. In the Final Results, Commerce based this refusal on a lack of record evidence from which it could accurately determine the cost of a letter of credit in Thailand. Commerce stated that it

> normally makes adjustments to data when we can determine whether an item's amount is clearly identified. Here, the Doing Business survey methodology shows that [letter of credit] costs are one potential cost. However, it is not clearly identified in the summary data, which are an aggregate of data points that are not broken down below the survey summary description, i.e., documents preparation.

Final Decision Memo at 18-19. Plaintiffs argue that the record shows "all Doing Business reports include the cost of the time and expense for procuring an export letter of credit embedded in the [B&H] fees and . . . the cost for . . . Thailand is $60." Yingqing Br. 34-35 (emphasis in original). In particular, the record contains email correspondence with the World Bank's Doing Business Unit, International Finance Corporation, "confirm[ing] that the cost of a letter of credit has always been and continues to be included in the reported figures for [B&H] under the subdivision for 'document preparation' fees," and that "[t]he cost to obtain the export letter of credit for . . . Thailand 2013 = $60." Yingqing's Surrogate

Values for Final Results – Part 11, Ex. 38, PD 87-98 at bar code 3172207-11 (Jan. 6, 2014), ECF No. 29. This information identifies the cost to obtain an export letter of credit for Thailand and fairly detracts from Commerce's finding that it could not identify the cost of the letter of credit. Accordingly, the court remands this matter for Commerce to reconsider its refusal to deduct the expense of obtaining a letter of credit in light of the information on the record from the World Bank.

### III. Conclusion

For the foregoing reasons, it hereby

**ORDERED** that Commerce's <u>Final Results</u> are sustained with respect to the selection of Thailand as the primary surrogate country; the valuation of Yingqing's factors of production as to paint, thinner, and corrugated paperboard; and the rejection, as untimely, of certain factual information submitted by Yingqing; it is further

**ORDERED** that this matter is remanded to Commerce to reconsider its allocation of labor costs and its valuation of Yingqing's B&H costs; it is further

**ORDERED** that Commerce shall file its remand results on or before February 22, 2017; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

_____/s/ Leo M. Gordon_____
Judge Leo M. Gordon

Dated: December 21, 2016
        New York, New York